# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DENNIS A. REID,                                                :
                                                               :
            Plaintiff,                                         :
                                                               :
    v.                                                         :   **C.A. No. 2874-VCS**
                                                               :
VINCENZO DAVIDE SINISCALCHI,                                   :
GIORGIO CAPRA, ALENIA SPAZIO,                                  :
ALCATEL ALENIA SPACE ITALIA SpA                                :
(f/k/a ALENIA SPAZIO) and                                      :
FINMECCANICA SpA,                                              :
                                                               :
            Defendants,                                        :
                                                               :
    and                                                        :
                                                               :
USRT HOLDINGS, L.L.C. and U.S.                                 :
RUSSIAN TELECOMMUNICATIONS,                                    :
L.L.C.,                                                        :
                                                               :
            Nominal Defendants.                                :

## MEMORANDUM OPINION

Date Submitted:  October 30, 2017
Date Decided:  January 30, 2018

David W. deBruin, Esquire of The deBruin Firm LLC, Wilmington, Delaware; Thomas I. Sheridan, III, Esquire of Simmons Hanly Conroy LLP, New York, New York; and Derek Y. Brandt, Esquire of Brandt Law LLC, Edwardsville, Illinois, Attorneys for Plaintiff.

Thomas A. Beck, Esquire and Rachel E. Horn, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Paul J. Vincenti, Esquire and Elyse C. Pillitteri, Esquire of Vincenti & Vincenti, P.C., New York, New York, Attorneys for Defendants Alenia Spazio, Alcatel Alenia Space Italia, S.p.A. and Finmeccanica, S.p.A.

**SLIGHTS, Vice Chancellor**

As we approach the eleven-year anniversary of the initiation of this action, *Reid v. Siniscalchi* has readily secured its place as a candidate for the *Jarndyce* award for interminable legal proceedings.[1]  Given how long the Court and the parties have been at this, it is remarkable, to say the least, that we would just now be addressing a motion for summary judgment on the ground that the Court lacks personal jurisdiction over necessary party defendants.  And yet, after more than eight years of jurisdictional and merits discovery, it is now abundantly clear that the theory of personal jurisdiction asserted in Plaintiff's various pleadings, and pressed successfully by Plaintiff in response to an early-stage Rule 12(b)(2) motion to dismiss, is, in fact, a myth.  That Plaintiff has managed to trade this myth as the truth for more than a decade is troubling.

Plaintiff's claims arise from a single memorandum of agreement between U.S. Russian Telecommunications L.L.C. ("USRT") and Finmeccanica, SpA ("FIN"), the provisions of which select English law and English arbitration for dispute resolution.  Apparently perceiving that the parties' choice of law and choice of forum/arbitration were no longer satisfactory, Plaintiff devised a fantasy Delaware-based conspiracy among the Defendants and pled those facts in his verified complaint as a basis to argue that this Court could exercise personal jurisdiction over

---

[1] *See* Charles Dickens, *Bleak House* (Bradbury & Evans ed., 1853).

the non-resident defendants. With implicit assurances that the evidence would bear out his claim, he then convinced the Court, in his response to Defendants' Rule 12(b)(2) motion, to follow him down a rabbit hole to a conspiracy "wonderland" where the Court and the parties have resided ever since. It is now time to return to reality.

The facts underlying the parties' dispute begin simply enough. Dr. Valery Aksamentov, a Russian scientist living and working in the United States, along with several of his colleagues in the aerospace industry, founded a company to pursue a business opportunity involving the replacement and commercialization of Russian satellites. The company, nominal Defendant, USRT, was formed as a Delaware limited liability company in December 1996.

Upon its inception, USRT engaged Plaintiff, Dennis Reid, to prepare a business plan and to assist USRT in obtaining financing for the satellite venture. When fundraising in the United States proved unsuccessful, USRT utilized the services of Defendant, Vincenzo Davide Siniscalchi, to pursue financing in Italy. This ultimately led USRT to seek financing from the Italian government. In September and October 1997, USRT representatives met with several Italian government ministers. Those meetings were facilitated by Siniscalchi and Defendant, Giorgio Capra, a Vice Admiral of the Italian Navy, advisor to the Italian Ministry of Defense and board member of the Italian Space Agency (a government

agency). Capra eventually became "USRT's primary point of contact and advocate in Italy."[2]

The Italian government determined that if Italy were to participate in the satellite venture, it would do so through Defendant, FIN, an Italian state-controlled entity.[3] Capra introduced USRT to FIN in December 1997, and USRT and FIN subsequently executed several memoranda of agreement "set[ting] forth the principles of agreement between them for the implementation of" a satellite development program.[4] The memorandum of agreement upon which Plaintiff's claims rest, dated May 12, 1998 (the "May 12 MOA"), is governed by the laws of the United Kingdom[5] and provides that any dispute between USRT and FIN arising in connection therewith "shall be settled" via binding arbitration under the ICC's Rules of Conciliation and Arbitration, with London, England as the venue.[6]

Notwithstanding the clear choice of law and venue provisions in the May 12 MOA, Plaintiff initiated this action in this Court on April 9, 2007. In his verified

---

[2] VX 23 (Nov. 4, 1999 memo from former USRT member Larry Bell to other former USRT members) ("Bell Memo") at BELLAK00113.

[3] At all times relevant to this action, FIN was 61% percent owned by Istituto per la Ricostruzione Industriale ("IRI") which, in turn, was 100% owned by Italy. Compl. ¶ 7; Gigante Aff. ¶ 3.

[4] VX 43 (Jan. 12, 1998 USRT-FIN Memorandum of Agreement) § 1.

[5] VX 1 (May 12 MOA) ¶ 10.

[6] VX 1 (May 12 MOA) ¶ 11.

3

complaint, Plaintiff alleged, among other things, the existence of a Capra-Siniscalchi-FIN conspiracy to misappropriate the satellite project from USRT for FIN's benefit. FIN responded with a motion to dismiss the complaint under Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction. Plaintiff, in reply, invoked the so-called "conspiracy theory" of personal jurisdiction. Plaintiff's conspiracy theory was premised on the following elements:

- Siniscalchi, Capra and FIN conspired to misappropriate the satellite project from USRT and, by extension, from USRT's (former) members;

- To that end, Siniscalchi, Capra and FIN (mis)represented to USRT that USRT had to be Italian-owned to obtain Italian government financing; and thereby "induce[d]" USRT's members to transfer ownership and control of USRT to Holdings, a Delaware limited liability company formed by Siniscalchi and wholly owned by Capra as of its formation;[7]

- Upon obtaining control of USRT, Capra caused USRT to refrain from enforcing its rights against FIN, and thereby allowed FIN to misappropriate the satellite project from USRT;

- Thus, Siniscalchi's formation of Holdings in Delaware was a substantial act in furtherance of the Capra-Siniscalchi-FIN conspiracy, and was executed with the knowledge of Capra and FIN;

---

[7] Pl.'s Answering Br. in Opp'n to FIN's Mot. to Dismiss the Compl. for Lack of Personal Jurisdiction and Lack of Standing 63–64 ("Pl.'s 2014 Br.") ("It was [FIN] who first told USRT it would have to be owned by Italians in order to obtain financing—a claim that was later shown to be a fabrication. Thus, the central falsehood that was communicated to the former members of USRT to induce them to give up control originated from [FIN].").

- Accordingly, Siniscalchi's act of forming Holdings in Delaware should be imputed to Capra and FIN for jurisdictional purposes; *and*

- Therefore, FIN's motion to dismiss must be denied.

Five years of jurisdictional discovery followed. The Court ultimately denied FIN's motion to dismiss, with the expectation that the parties would engage in additional discovery.[8] In denying the motion, the Court noted that Plaintiff's evidence of a conspiracy was "not especially strong" and that "other inferences appear more probable."[9] Nevertheless, the Court determined that, at the motion to dismiss stage, Plaintiff had "alleged facts" that were sufficient to defeat the motion.[10] The Court contemplated that the personal jurisdiction issue may well be revisited following merits discovery. That is where we are now.[11]

With the fruits of more than eight years of jurisdictional and merits discovery, FIN and its affiliates, co-defendants, Alenia Spazio ("Alenia") and Alcatel Alenia Spazio Italia, SpA (collectively, "FIN"), have moved for summary judgment on both

---

[8] *Reid v. Siniscalchi*, 2014 WL 6589342, at *13 (Del. Ch. Nov. 20, 2014) (Noble, V.C.) (*Reid II*).

[9] *Id.* at *13.

[10] *Id.*

[11] *See id.* at *10 (noting that "now is not the time to decide" the full nature and scope of the alleged conspiracy). *See also Optimacare, Inc. v. Hightower*, 1996 WL 417510, at *3 (Del. Ch. July 17, 1996) (denying a motion to dismiss under Court of Chancery Rule 12(b)(2) but noting that the court "may consider the issue of lack of personal jurisdiction . . . after the parties fully develop the record").

personal jurisdiction and merits grounds. According to FIN, discovery has revealed that Plaintiff's conspiracy theory is a "sham."[12] As if to reveal the shocking twist in the final pages of a lengthy thriller novel, the now-developed evidence demonstrates that Plaintiff has managed for eleven years to misdirect the Court by projecting onto FIN his own scheme to exclude the former members of USRT from the satellite project's benefits. As it turns out, it was Plaintiff himself who (i) secretly orchestrated a takeover of USRT; (ii) maneuvered to oust USRT's management and assert control over USRT; (iii) directed, or at least, consented to the formation of Holdings to facilitate the takeover; (iv) formulated a secret plan to deprive USRT's former members of their rights to receive payments; and then (v) attempted to destroy the evidence of his plan.

Now that Plaintiff's conspiracy theory has been exposed as a falsehood, FIN argues that Siniscalchi's act of forming Holdings in Delaware cannot serve as a basis for the Court to exercise personal jurisdiction over any of the non-resident defendants. Since the alleged Capra-Siniscalchi-FIN conspiracy is the only jurisdictional hook proffered by Plaintiff, and that hook has been revealed in the competent undisputed evidence to be a fiction, FIN urges the Court to end Plaintiff's

---

[12] Br. in Supp. of FIN's Mot. for Summ. J. 1 ("FIN's Opening Br.").

6

charade by granting the motion for summary judgment for want of personal jurisdiction. For the reasons discussed below, I will gladly oblige.

## I. FACTUAL BACKGROUND

I draw the facts from the admitted allegations in the pleadings, the materials submitted by the parties in support of and opposition to FIN's motion for summary judgment and those matters of which the Court may take judicial notice.[13] Unless otherwise indicated, I have determined that the following facts cannot fairly be disputed.

### A. Parties and Relevant Non-Parties

Nominal Defendants, USRT and Holdings, are Delaware limited liability companies.[14] USRT's founding principals were Aksamentov, Mike Simon, David Mazaika, George Schuh, Larry Bell, Space Marketing, Inc. ("SMI"), a company founded by Mike Lawson, and International Space Enterprises, Inc. ("ISE"), a company founded by Aksamentov, Simon, Mazaika, Schuh and Bell.[15]

---

[13] Exhibits submitted by FIN attached to the affidavits of Paul J. Vincenti, Esq., dated June 26, 2017 and September 25, 2017, are cited as "VX [#]." Exhibits submitted by Plaintiff attached to the affidavit of Thomas I. Sheridan, III, Esq., dated August 11, 2017, are cited as "SX [#]."

[14] Compl. ¶¶ 2–4.

[15] Aksamentov Dep. 68:21–69:4; VX 21 (July 13, 1999 letter written by Bell to Simon enclosing "Appendix A-1 USRT Overview") ("USRT Overview") at BELLAK00258–60. Aksamentov, Simon, Mazaika, Schuh, Bell, SMI (now defunct), Lawson and ISE are not parties to this action. *See* Compl. ¶¶ 3–4, 6–10; Lawson Dep. 26:7–13.

On October 5, 1998, Holdings acquired all of USRT's membership interests. Thus, USRT presently is a wholly-owned subsidiary of Holdings.[16]

Plaintiff, Reid, is a citizen and resident of Canada. He owns a 10% membership interest in Holdings.[17] At various times relevant to this dispute, Reid served as USRT's financial consultant, then as Chairman of USRT's Finance/Audit Committee and then as USRT's Manager and Chief Financial Officer.[18]

Defendant, Siniscalchi, is a citizen and resident of the United States.[19] USRT engaged Siniscalchi to pursue Italian financing for USRT's satellite project. In September 1997, USRT entered into a finders agreement with a Siniscalchi-managed entity, Global Strategies Services Ltd. ("GSS"), pursuant to which GSS agreed to facilitate a joint venture transaction between USRT and certain Italian telecom companies in exchange for a success fee.[20] Following Holdings' acquisition

---

[16] Compl. ¶ 5; VX 28 (Oct. 5, 1998 USRT-Holdings Acquisition Agreement) § 1.1.

[17] Compl. ¶¶ 1, 3.

[18] VX 13 (Jan. 20, 1998 fax from Reid to Jon Reed, attaching document entitled "A Brief History of USRT") at DEL0012256; VX 16 (USRT resolution, dated Oct. 7, 1998).

[19] Siniscalchi Dep. 17:14–19 (Aug. 22, 2013) ("Siniscalchi 2013 Dep.").

[20] VX 29 ("Sept. 1997 USRT-GSS Finder Agreement") at Recitals; *id.* § 4; *id.* at DEL0008693 (GSS signature line signed by "V. Davide Siniscalchi" in his capacity as a GSS "director").

8

of USRT, Siniscalchi was named as USRT's Chief Operating Officer.[21] Siniscalchi was dismissed from this action in 2007.[22]

Defendant, Capra, is a citizen and resident of Italy and was a Vice Admiral of the Italian Navy, an advisor to the Italian Ministry of Defense and board member of the Italian Space Agency (a government agency).[23] Capra facilitated discussions between USRT and the Italian government regarding Italian financing of USRT's satellite project and became "USRT's primary point of contact and advocate in Italy."[24] It appears he was also GSS's sole owner.[25] Following Holdings' acquisition of USRT, Capra was named as USRT's Chief Executive Officer.[26] Capra never entered an appearance and Plaintiff has represented that he "no longer intends to proceed against [Capra] as a defendant in this action."[27]

---

[21] VX 16 (USRT Resolution, dated Oct. 7, 1998).

[22] Dkt. 14 (Notice of Voluntary Dismissal of Defendant Vincenzo Davide Siniscalchi).

[23] Compl. ¶ 7.

[24] VX 23 (Bell Memo) at BELLAK00113.

[25] *See, e.g.*, Reid Dep. 186:18–22 (GSS "was set up . . . if I remember correctly [with] Capra . . . [as the] sole owner . . . and Siniscalchi [as] the director . . . .").

[26] VX 16 (USRT Resolution, dated Oct. 7, 1998).

[27] Dkt. 300 (Pl.'s Br. in Supp. of His Mot. to Amend the Caption and Strike Objs. and Compel Defs.' More Complete Disc. Resps. and Produc. of Docs. 1).

Defendant, FIN, is an Italian business entity headquartered in Rome, Italy.[28] FIN, through its ALS division, manufactured satellites and satellite parts.[29] In the mid-1990s, FIN sold satellite parts as a subcontractor to Loral, a United States manufacturer, for Yamal-100, a telecommunications satellite developed, launched, owned and operated by JSC Gascom ("Gascom") and RSC Energia ("Energia"), Russian companies involved in the replacement of Russian satellites.[30] At all relevant times, FIN was 61% owned by IRI which, in turn, was 100% owned by the Italian government.[31] Defendant, AALS, is an Italian business entity that is the successor to Defendant, ALS. ALS, in turn, was a division of FIN at all times relevant to this action.[32]

Non-party, Jon Reed, was involved with SMI and began assisting Lawson with USRT business in early/mid-1997.[33] Reed's self-designated role was "to keep

---

[28] Compl. ¶ 9.

[29] VX 3 (Dec. 12, 1997 memo from Lawson to Aksamentov) at DEL00008688; VX 4 (Affidavit of Reid, dated Mar. 26, 2007, filed in previous Texas litigation) ¶ 15.

[30] VX 6 (printout of JSC Gazprom Space Systems "Implemented Projects" webpage as of Jan. 15, 2015) at 1; VX 7 (minutes of Mar. 4, 1999 ALS-Gascom meeting) at DEL0004200; Piantella Dep. 142:3–145:8. Paolo Piantella was a general co-director of ALS from 1991 to mid-1997 and subsequently served ALS's vice president of marketing strategies. Piantella Dep. 19:4–20:13.

[31] Compl. ¶ 7; Gigante Aff. ¶ 3.

[32] Compl. ¶ 10.

[33] Reed Dep. 31:13–33:1, 35:24–38:1.

everyone [involved with USRT] in communications . . . [and to] coordinat[e] meetings, conversations, [and] paperwork."[34]  By performing these tasks, Reed "became involved [with USRT] through osmosis . . . ."[35]

Non-party, Russian Satellite Communications Company ("RSCC"), a Russian government-owned entity, was responsible for managing the commercialization and licensing of certain of Russia's geostationary orbital slots, including the slots at longitudes 14ºW, 11ºW, 40ºE, 53ºE, 80ºE, 90ºE, 96.5ºE, 99ºE, 103ºE, 140ºE and 145ºE (collectively, the "Development Slots").[36]  As of March 1998, RSCC's

---

[34] Reed Dep. 37:11–15.

[35] Reed Dep. 35:22–23.

[36] Compl. ¶ 12; Askamentov Dep. 78:22–79:7; VX 64 (Russian government bidding rules, sent to USRT in Aug. 1997) at DEL0008429; *see* Askamentov Dep. 30:5–10. A geostationary satellite is a satellite in a direct, circular orbit around the Earth, in the plane of the equator, at an altitude of approximately 35,800 kilometers above the Earth's surface (a "geostationary orbit").  *See* NASA, Catalog of Earth Satellite Orbits, http://earthobservatory.nasa.gov/Features/OrbitsCatalog/ (last updated Sept. 4, 2009) ["NASA, Satellite Orbit Catalog"]; D.R.E. 202(b)–(c) (The court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").  Geostationary orbital slots are assigned by the International Telecommunications Union ("ITU"), a specialized agency of the United Nations, and are designated by specific longitudinal coordinates, which correspond to the longitude of the equatorial point directly below that slot.  ITU, *About ITU*, http://www.itu.int/en/about (last visited Jan. 29, 2018); *see* SX 6 (The Boeing Company's map of commercial communication satellites in geostationary orbit as of June 30, 2012).

11

authority to manage the commercialization and licensing of the Development Slots was transferred to another Russian company, non-party InSpace JSC ("InSpace").[37]

## B. The May 12, 1998 USRT-FIN Memorandum of Agreement

The May 12 MOA "set[s] forth the principles of agreement between" USRT and FIN for the execution of the following satellite development projects:[38]

- the "Gals Project," which contemplated the "putting into service of" two telecommunications satellites in the orbital slots "86.1 East and/or 110 East and/or 140 East";[39]

- the "Small Satellites Project," which contemplated "the putting into service of" several small satellites "to provide regional services";[40]

- the "Multimedia Project," which contemplated "the putting into service of up to 5 satellites, to provide multimedia services";[41] *and*

- the "Marathon Project," which contemplated "the putting into service of" three to five telecommunications satellites in the orbital slots "40 East and/or 90.5 East and/or 145.5 East, 13.5 West and/or 160 West."

---

[37] Compl. ¶ 20; VX 64 (Russian government bidding rules, sent to USRT in Aug. 1997); VX 66 (Mar. 28, 1998 letter from InSpace to Lawson).

[38] VX 1 (May 12 MOA) ¶ 2. The May 12 MOA by its terms supersedes and voids prior USRT-FIN memoranda of agreement. *Id.*

[39] VX 1 (May 12 MOA) ¶ 1a.

[40] *Id.*

[41] *Id.*

In the May 12 MOA, USRT and FIN "mutually acknowledge" the following:

- that USRT, FIN and InSpace had "expressed their interest in setting up a joint venture arrangement for the phased implementation and exploitation of the Projects";[42]

- that the first phase ("First Phase") would include "the manufacturing, putting into service and operation of two satellites relevant to the Gals Project and one or more satellites included in the projects as further agreed between [USRT, FIN and InSpace]";[43]

- that the implementation of the First Phase was estimated to require a total investment of $650 million;[44] *and*

- that USRT and FIN, "taking advantage of Italian laws and regulations, [were] expected to be able to avail themselves of . . . financing facilities for the realization of the satellites of the First Phase for a maximum amount of US$450 Million . . . ."[45]

The May 12 MOA also provides, in relevant part:

- that the understandings expressed therein would "be regulated by final agreements to be negotiated in good faith on the basis of the terms [thereof]";[46] provided that—

  - those final agreements would only become effective upon the satisfaction of the financing conditions specified in the May 12 MOA;[47] *and*

---

[42] VX 1 (May 12 MOA) ¶ 1c.

[43] *Id.*

[44] VX 1 (May 12 MOA) ¶ 1d.

[45] VX 1 (May 12 MOA) ¶ 1f.

[46] VX 1 (May 12 MOA) ¶ 5.

[47] *Id.*

- pending USRT and FIN's entry into those final agreements, either party could terminate the May 12 MOA on advance written notice of thirty days to the other party;[48]

- that USRT and FIN would "undertake to pursue jointly the Projects";[49]

- that "any action [by USRT or FIN] toward third parties [would] be previously agreed upon" between USRT and FIN;[50]

- that neither USRT nor FIN would "undertake any action which could adversely affect the implementation of their joint business";[51]

- that any information "relevant to" the May 12 MOA or "exchanged by the parties in the negotiations deriving therefrom" would be kept confidential and neither USRT nor FIN would disclose such information to third parties without the other's prior approval;[52] *and*

- that the May 12 MOA is governed by the laws of the United Kingdom,[53] and any dispute between USRT and FIN arising in connection with the May 12 MOA "shall be settled" via binding arbitration under ICC's Rules of Conciliation and Arbitration, with London, England as the venue for arbitration.[54]

---

[48] VX 1 (May 12 MOA) ¶ 7.

[49] VX 1 (May 12 MOA) ¶ 6.

[50] *Id.*

[51] *Id.*

[52] VX 1 (May 12 MOA) ¶ 8.

[53] VX 1 (May 12 MOA) ¶ 10.

[54] VX 1 (May 12 MOA) ¶ 11.

The May 12 MOA thus defined the parameters of USRT and FIN's business relationship. It is now the focal point of Plaintiff's claims in this action.[55]

## C. Plaintiff's "Conspiracy Theory"

Plaintiff commenced this action by verified complaint filed April 9, 2007 (the "Complaint"). The Complaint posits the existence of a Capra-Siniscalchi-FIN conspiracy to misappropriate a valuable business opportunity from USRT for FIN's benefit. Specifically, the Complaint alleges:

- In the spring of 1998, USRT, FIN and InSpace "agreed to form a joint venture to finance, manufacture, commercialize, and exploit [Russian] satellite slots."[56]

---

[55] Plaintiff now acknowledges that the May 12 MOA is the document that "governs" his claims here. Dkt. 458 (Tr. of Oral Arg. on the issue of choice of law) at 32:21–22 (acknowledging that the May 12 MOA is the "governing document" with regard to the USRT-FIN business relationship); Pl.'s Br. in Opp'n to FIN's Mot. for Summ. J. 56–57 ("POB"). He also acknowledges that he is no longer pressing "conspiracy" as a substantive cause of action. *See* POB at 58 n.24.

[56] Compl. ¶ 21. The Complaint, however, does not identify which Russian satellite slots are within the scope of the (alleged) USRT-FIN-InSpace joint venture agreement. Nor does the Complaint identify a particular agreement concluded among USRT, FIN and InSpace. On April 8, 1998, USRT, FIN and InSpace executed a tripartite "Memorandum of Understanding" to "create the basis for the joint activities of [USRT, FIN and InSpace] in financing, manufacturing, launching and operating commercial communications satellites" in the context of certain development projects. VX 45 (April 1998 USRT-FIN-InSpace MOU) at Recitals. The projects referenced in the April 1998 USRT-FIN-InSpace MOU are the same projects specified in the May 12 USRT-FIN MOA. *Compare* VX 45 at Recitals, *with* VX 1 (May 12 MOA) ¶ 1a. The April 1998 USRT-FIN-InSpace MOU was superseded and voided by a May 15, 1998 USRT-FIN-InSpace memorandum of agreement, which itself terminated in July 1998. VX 46 (May 1998 USRT-FIN-InSpace MOA) §§ 3, 11; VX 48 (memo prepared by Reid in late summer/fall of 1998) at 10162; VX 49 (Reid's handwritten notes, undated) at 11414 ¶ 3; Reid Dep. 954:15–955:3. None of this is mentioned in the Complaint, however.

15

- During the summer of 1998, Capra, Siniscalchi and FIN "agreed to work in concert with one another to divest USRT of the benefits of the joint venture, to misappropriate USRT's assets and to usurp USRT's business opportunities."[57]

- To carry out this conspiracy, Siniscalchi and Capra induced USRT's members to sell their membership interests in USRT to Holdings, a Delaware entity formed by Siniscalchi and wholly owned by Capra as of its formation. In this regard, Siniscalchi and Capra told "USRT that the Italian government would not [finance the satellite project] unless USRT was owned entirely by Italian citizens," and did so at FIN's direction or with FIN's knowledge.[58]

- USRT's members, in fact, sold their membership interests to Holdings, following which Capra appointed himself CEO of USRT, Siniscalchi COO and Reid CFO.

- Thereafter, with Capra in control of USRT, Siniscalchi, Capra and FIN carried out the alleged conspiracy. Reid was "asked to participate in [the conspiracy], but refused and [was] promptly terminated from USRT."[59] In late 1999, FIN "began implementation (without URST's participation) of the business plan developed by USRT by launching the first replacement satellite. . . . Additional satellites have been or are planned to be launched in accordance with" USRT's business plan.[60]

- FIN was "able to accomplish this only because of the change of control of USRT that had been effectuated in Delaware."[61]

---

[57] Compl. ¶ 25.

[58] Compl. ¶ 26.

[59] Compl. ¶ 30.

[60] Compl. ¶ 31.

[61] Compl. ¶ 30.

FIN initially moved to dismiss the Complaint based on the statute of limitations and laches, as well as for lack of personal jurisdiction. The Court dismissed the action as time-barred, but the dismissal was subsequently reversed by the Delaware Supreme Court.[62]

On remand, the Court afforded Plaintiff the opportunity to undertake jurisdictional discovery. Five years of jurisdictional discovery followed, after which FIN moved to dismiss the Complaint for lack of personal jurisdiction and lack of standing. Plaintiff opposed the motion.

With regard to the jurisdictional issue, Plaintiff maintained that the Court could (and should) exercise personal jurisdiction over FIN based on the "conspiracy theory" of jurisdiction.[63] According to Plaintiff, FIN "conspired with Capra and Siniscalchi to neuter USRT for the benefit of [FIN],"[64] and Siniscalchi formed Holdings in Delaware at FIN's direction—or with FIN's approval—specifically to carry out that conspiracy.[65] Thus, Plaintiff argued, Siniscalchi's formation of

---

[62] *Reid v. Siniscalchi*, 2008 WL 821535, at **12–13 (Del. Ch. Mar. 27, 2008) ("*Reid I*"), *rev'd sub nom.*, *Reid v. Spazio*, 970 A.2d 176 (Del. 2009).

[63] Pl.'s 2014 Br. at 55.

[64] Pl.'s 2014 Br. at 60, 63–64.

[65] Pl.'s 2014 Br. at 63–64.

17

Holdings was attributable to FIN for jurisdictional purposes.[66] In support of his

conspiracy theory of jurisdiction, Plaintiff proffered the following facts:

- "[FIN], Capra and Siniscalchi told USRT that USRT had to be Italian-owned in order to obtain financing. That was a lie, and it originated with [FIN]."[67] "Thus, the central falsehood that was communicated to the former members of USRT to induce them to give up control [of USRT] originated from [FIN]."[68]

- Siniscalchi insisted that the existence of Holdings and Holdings' acquisition of USRT be kept confidential to "reduc[e] the likelihood that the [alleged Capra-Siniscalchi-FIN] conspiracy would be discovered—while giving [FIN] plausible deniability."[69]

- Following Holdings' acquisition of USRT, Siniscalchi fired USRT's counsel, Mallenbaum, after Mallenbaum sent a complaint letter to FIN alleging that FIN had violated the May 12 MOA.[70] Capra (or Siniscalchi) subsequently fired Reid after Reid "rejected [FIN's] bribe" to transfer USRT's rights in the satellite project to FIN.[71]

- "In forming Holdings, acquiring USRT, firing [Plaintiff], and allowing [FIN] to violate USRT's rights, Capra (through his agent Siniscalchi) was acting" solely for FIN's benefit.[72]

---

[66] Pl.'s 2014 Br. at 55, 59–60.

[67] Pl.'s 2014 Br. at 58.

[68] Pl.'s 2014 Br. at 63–64.

[69] Pl.'s 2014 Br. at 36.

[70] Pl.'s 2014 Br. at 39 ("If Siniscalchi had not been in league with [FIN], he would not have fired Bryan Cave."); SX 111 (Bryan Cave's Oct. 7, 1999 complaint letter to FIN).

[71] Pl.'s 2014 Br. at 50.

[72] Pl.'s 2014 Br. at 58.

The Court denied FIN's motion to dismiss. Specifically, the Court held: "Reid alleges that [FIN] engineered a conspiracy to misappropriate a valuable opportunity for itself. He has *alleged facts* from which the Court can infer the existence of such a conspiracy. While Reid's evidence is not especially strong, the inferences that he makes are consistent with the record."[73]

The parties have since engaged in three years of merits discovery, followed by choice-of-law litigation. FIN now moves for summary judgment, either for lack of personal jurisdiction or on the merits.

### D. Plaintiff's Conspiracy Debunked

Plaintiff's conspiracy theory of jurisdiction is premised on a single Delaware act—namely, Siniscalchi's creation of Holdings. According to Plaintiff, Capra, Siniscalchi and FIN conspired to misappropriate the satellite project from USRT for FIN's benefit, and Siniscalchi formed Holdings in Delaware at FIN's direction—or with FIN's approval—in order to accomplish the misappropriation. Merits discovery, however, has proven Plaintiff's conspiracy theory to be a sham.

---

[73] *Reid II*, 2014 WL 6589342, at *13 (emphasis supplied).

### 1. Events Leading Up to Holdings' Acquisition of USRT

Throughout the spring and summer of 1998, USRT's and FIN's efforts to obtain the requisite financing for the satellite project continued to fall flat.[74] During this same time, perhaps not coincidentally, USRT began to experience significant intra-company conflict.[75] Reid was frustrated with his compensation arrangements with USRT, as was Reed, and both harbored doubts that USRT's then-existing management was capable of executing the satellite project.[76] In Reid's view, what USRT needed was a "point person" who "actually [could] command leadership"[77]— "someone who [would say], 'okay, guys, I've got a handle on the whole blasted operation, and you're going to do what I'm saying.'"[78] Reed concurred.[79]

---

[74] VX 21 (USRT Overview) at BELLAK00285–86. Plaintiff submits that FIN "could have applied for funding at any time after the May 15 MOA . . . [but] delayed doing so . . . until after" Holdings' acquisition of USRT. POB at 35. Plaintiff does not cite any evidence in support of this statement, and the statement is, in fact, contradicted by the record. *See, e.g.*, VX 74 (July 3, 1998 financing submission made by FIN to Italy's Ministry of Industry, Commerce and Handcraft, copying Italy's Ministry of the Treasury, Budget and Economic Planning, among others).

[75] *See* VX 21 (USRT Overview) at BELLAK00279–80; *see generally* VX 26 (transcript of telephone calls between Reid and Reed, Lawson and Bell in April–May 1998, recorded by Reid).

[76] Reid Dep. 478:18–479:22, 505:11–506:21, 512:21–513:23; Reed Dep. 55:3–14; *see generally* VX 26.

[77] VX 26 at 237:22–25 (transcript of Reid-Reed phone call in late April 1998).

[78] VX 26 at 237:6–9.

[79] VX 26 at 236:21–239:12; Reed Dep. 90:9–92:12.

In June 1998, Reid and Reed began developing a plan to restructure USRT and replace its existing management.[80] Reid and Reed's plan contemplated (1) that Siniscalchi and Capra would acquire equity in and operational control of USRT, and (2) that Reid and Reed would then join Capra and Siniscalchi as salaried officers and

---

[80] VX 86 (Memorandum on Possible Restructuring prepared by Reid, dated Aug. 22, 1998) ("Reid Restructuring Memo") at DEL0012174–75 (stating that "[t]his Memorandum is assumptive based upon preliminary discussions over the last two months with [Siniscalchi]," and outlining a scenario in which (1) USRT's members would "assign 63.5% of the Company to Capra and his team," (2) Reid would become a 4.5% owner of USRT and its CFO; and (3) Reed would become a 4.5% owner of USRT and its VP of Operations); Reed Dep. 141:7–21; VX 92 ("Chronology of Relevant Events," prepared by Reid, dated Sept. 9, 1999) ("Reid Chronology") at DEL0011688 ("1998 . . . *Reid proposes takeover of USRT by the Italians.* Proposal agreed.") (emphasis added); Reid Dep. 1513:11–18 ("Q: But you wrote [VX 92]; is that right? A: I wrote this document. Q: That is your language? A: Yes, it is. Q: And that is dated September 9, 1999? A: Yes, it is.").

Plaintiff continues to maintain that "Capra, [FIN], and Siniscalchi told USRT that in order to secure financing from the Italian government, USRT would have to be owned by Italians," and that "[t]he source of this claim was [FIN]." Pl.'s Br. in Opp'n to FIN's Mot. for Summ. J. 20 ("POB"). Reid and USRT's former members have admitted, however, that they never communicated with FIN about the alleged "Italian-owned" requirement. Reid Dep. 1131:3–15, 1477:11–1478:12; Lawson Dep. 346:12–347:9; Aksamentov Dep. 568:4–569:12, 591:4–592:20, 661:1–9; Bell Dep. 243:12–21, 341:16–24; Reed Dep. 176:8–178:14. Moreover, Plaintiff has not adduced any *admissible* evidence that FIN was the source of the alleged Italian-owned requirement. Plaintiff seeks to admit into evidence an excerpt of Siniscalchi's deposition testimony in a 2002 Texas case wherein Siniscalchi states that FIN wrote a letter to that effect (based on an on-record representation by his attorney). *See* POB 20–21. Siniscalchi's 2002 deposition testimony is hearsay—as is the predicate on-record statement by his attorney—and it is inadmissible against FIN to establish that FIN, in fact, wrote the alleged letter (which has never been found, as Plaintiff himself admits). D.R.E. 801(c), 802; POB at 21 ("The actual letter has not been found."). And then, of course, there is Reid's September 9, 1999 "Chronology of Relevant Events" document, in which Reid writes: "1998 . . . Reid proposes takeover of USRT by Italians. Proposal agreed." VX 92 at DEL0011688. When asked about VX 92 during his deposition, Reid explained, "I'm not sure what this is referring to . . . . I didn't propose a takeover of USRT by the Italians." Reid Dep. 1512:15–1513:3.

equity owners of the new Capra-controlled USRT.[81] Reid and Reed took pains to ensure that the true design of their plan was concealed from USRT's other members.[82]

On August 2, 1998, as reflected in Reid's handwritten notes, Reed briefed Siniscalchi "with full confidentiality" on the "process" for implementing the Reid/Reed plan, and the plan's "end result."[83] The following day, USRT received a "long, angry letter" from Siniscalchi in which he sharply questioned the competence of USRT's then-existing leadership.[84] Two days later, as if on cue, Reed (with Reid's assistance) prepared and sent a letter to USRT's board in which he listed additional criticisms of USRT's management.[85]

---

[81] VX 86 (Reid Restructuring Memo) at DEL0012174–75.

[82] VX 86 (Reid Restructuring Memo) at DEL0012174 (stating that "[t]his Memorandum is prepared without the knowledge or direction of the Membership, the Board or Counsel of [USRT] . . . ."); Reid Dep. 775:12–776:4, 790:5–15 (testifying that VX 86 was the result of "various discussions" with some, but not all of USRT's members); VX 94 (Aug. 25, 1998 fax from Reid to Siniscalchi, advising Siniscalchi that "if you are speaking with anyone" at USRT, "it would be prudent" not to discuss Reed's health, as such discussion "would clearly suggest that you have been in communication with [Reed] today").

[83] VX 89 (note written by Reid, dated Aug. 2, 1998); Reid Dep. 747:17–749:3.

[84] VX 21 (USRT Overview) at BELLAK00285; SX 170 (Siniscalchi's "long, angry letter" to USRT, in which Siniscalchi writes, among other things, "Why should I go the extra mile to make your dream (not my dream) come true when you yourself do nothing to ensure success?"); *see* Bell Dep. 257:6–260:21.

[85] VX 14 (USRT internal documents, dated as of Aug. 5–10, 1998, including Reed's letter) at DEL0015630–43.

Shortly thereafter, USRT offered Capra employment as USRT's CEO.[86] Capra responded favorably to USRT's proposal, and suggested that USRT's offer should include a "reasonable salary," deferred compensation and benefits.[87] He did not, however, request any equity in USRT.[88] Capra also advised USRT that he would not accept its employment offer unless USRT also retained Siniscalchi as COO.[89] This was in line with Reid and Reed's shared view that USRT needed a "point person" who "actually [could] command leadership."[90] A meeting between Capra, Siniscalchi and USRT to discuss the terms of Capra's employment was scheduled for August 28, 1998 (the "Chicago Meeting").[91] USRT advised its

---

[86] VX 21 (USRT Overview) at BELLAK00286; Lawson Dep. 321:8–24.

[87] VX 14 (USRT internal documents, dated as of Aug. 5–10, 1998) at DEL0015645.

[88] *See id.*

[89] VX 14 (USRT internal documents, dated as of Aug. 5–10, 1998) at DEL0015645. In addition, Capra insisted that he "retain the right to divulge [his] new position in USRT when [he] deem[ed] most appropriate." *Id.*

[90] VX 26 at 237:22–25 (transcript of Reid-Reed phone call in late April 1998); *see also* VX 26 at 236:10–24 (Reid: "[Y]ou know what I was thinking last night, by the way, just as a thought to throw out?" Reed: "What's that?" Reid: "You know what USRT needs and it's not there yet?" Reed: "What's that?" Reid: "They have the title maybe, but the title's wrong. They have a chairman and CEO. And I have no, no difficulty with [Aksamentov] in that role. I think, frankly, he deserves it, and he's good at it." Reed: "But what you're talking about is a COO." Reid: "Yes." Reed: "I know.").

[91] VX 90 (Minutes of Aug. 21, 1998 USRT board meeting) at DEL0009274; Reed Dep. 127:13–128:10.

members that there were to be no negotiations with Capra or Siniscalchi unless Aksamentov and Lawson were involved.[92]

In anticipation of the Chicago Meeting, Reid prepared a detailed "Discussion Points" document, a script of sorts, for Capra and Siniscalchi to follow at the meeting.[93] The document advises that Siniscalchi take certain actions—or make certain statements—at the Chicago Meeting based on the conduct of the other meeting participants or in the presence of certain people at the meeting.[94] For instance, if Bell and his attorney were present, Siniscalchi was to take offense so that the "meeting [would] not have [a] cordial start."[95]

---

[92] VX 91 (Aug. 23, 1998 memo from Aksamentov and Lawson to USRT's members) at DRDEL018577.

[93] VX 95 ("Discussion Points").

[94] VX 95 (Discussion Points) at DEL0010715, 10721.

[95] VX 95 (Discussion Points) at DEL0010721. When asked about VX 95 during his deposition, Reid explained: "[VX 95] is again [me] trying to put into [a] document as a reference for later referral statements [Siniscalchi had] made already . . . ." Reid Dep. 899:17–21. This explanation makes no sense, however, given that many of the statements in VX 95 are phrased as suggestions or directions *to* Siniscalchi; *e.g.*, "The current tone should be consistent with the past and perhaps build"; "[Siniscalchi's] initial reaction may/should be . . . David [Siniscalchi] is friendly, and speaking with friends—but firm on business principles. Business tone is set early, and pressure is felt." VX 95 (Discussion Points) at DEL0010721–22.

The day before the Chicago Meeting, Reid met covertly with Capra and Siniscalchi at the Chicago O'Hare Hilton to prepare them for the meeting.[96] Reid advised Siniscalchi to keep secret from USRT's members (other than Reed) the communications between Reid/Reed, Capra and Siniscalchi (including the fact that Reid/Reed had secretly travelled to Chicago to prepare Capra and Siniscalchi for their upcoming meeting with USRT).[97] He also gave Siniscalchi a final "Discussion Points" document for Siniscalchi and Capra's use at the meeting. This document contained various handwritten notes by Reid reflecting that all involved expected

---

[96] VX 94 (Aug. 25, 1998 fax from Reid to Siniscalchi); Reid Dep. 820:20–821:19, 852:3–853:23.

[97] VX 94 (Aug. 25, 1998 fax from Reid to Siniscalchi, advising Siniscalchi that "if you are speaking with anyone" at USRT, "it would be prudent" not to discuss certain facts about Reed's health, as "[s]uch knowledge or enquiry would clearly suggest that you have been in communication with him today"). Notwithstanding the overwhelming evidence to the contrary, Reid summarily denies that his and Reed's communications with Capra/Siniscalchi were kept secret from USRT's members. *Compare* Reid Dep. 861:14–22, *with* VX 174–75 (confidentiality warnings from USRT to Reid and Reed, dated Sept. 16, 1998); Aksamentov Dep. 588:11–18 (stating that Aksamentov instructed USRT's counsel to send VX 174–75 to Reid and Reed); Lawson Dep. 509:12–15 ("Well, after looking at the documentation for the first time of what was going on behind the scenes, I can say [Reid and Reed] acted in bad faith as it relates to [USRT's] former members."); Bell Dep. 259:2–14 ("Q: And were you aware that Dennis Reid was helping Davide Siniscalchi write [preparatory memoranda] for presentations to USRT? A: No. Q. Does that surprise you? A. Does it surprise me? Does it please me? No. Does it surprise me? There's very little about this deal that surprise[s] me anymore, okay? I'm sort of beyond surprised. . . . I'm surprised like Alice in Wonderland was—was—was surprised when—when she met the Mad Rabbit or whoever it was, you know. You know, I mean, it's all—all kind of surprising.").

Siniscalchi and Capra to conduct themselves with "POWER!" in their negotiations with USRT.[98]

At the Chicago Meeting, it was agreed that USRT's members would sell a 70% equity interest in USRT to Capra and Siniscalchi for $50 million upon USRT's receipt of approximately $550 million in financing from the Italian government.[99] Soon thereafter, however, Capra and Siniscalchi returned to USRT with a demand for 100% equity ownership and the immediate transfer of control of USRT to Capra/Siniscalchi.[100] Apparently fearing that the project was nearing its final breath, USRT's Board agreed to these terms.[101]

Reid reviewed drafts of the acquisition agreement for Capra and Siniscalchi's benefit (and for his own),[102] and suggested that Capra and Siniscalchi seek revisions

---

[98] VX 95 (Discussion Points) at DEL001019–21.

[99] VX 21 (USRT Summary) at BELLAK288; VX 96 (minutes of Aug. 21, 1998 USRT board meeting) at DEL0015700.

[100] VX 15 (Aug. 26, 1998 memo from Simon to Bell); VX 97 (undated notes written by Reid regarding USRT-Holdings transaction) ("Reid's Deal Notes").

[101] VX 98 (agenda for Aug. 30, 1998 USRT board meeting); VX 99 (Sept. 8, 1998 letter from USRT's counsel to USRT's members).

[102] Reid Dep. 967:24–968:16 ("Q: Why is Mr. Siniscalchi sending you drafts of the acquisition agreement?" A: Because as this was being developed, Siniscalchi had, along with Capra, determined that to go forward, he wanted a certain team and . . . he had already enumerated that he wanted Aksamentov, Reed, myself, and, in fact, he did not want a legal counsel. So I understood that there was a potential that I would be continuing with the USRT venture under this new entity structure . . . so in which case, I'm looking at this to

unfavorable to USRT's then-existing members.[103]  For instance, Reid advised

Siniscalchi that he should "demand, and receive all of the records of [USRT]

immediately" and should "reserve the right to withhold payment of" the purchase

price in the event any misrepresentations were discovered.[104]  Reid also advised

Siniscalchi that the acquisition agreement should include a confidentiality provision

"effective immediately (to limit whatever communication [was] occurring with

[FIN])." [105]  Importantly, the acquisition vehicle changed as the acquisition

---

make certain that the agreement that we have going forward is something that we can live with.").

[103] VX 100 (draft of USRT-Holdings acquisition agreement); VX 101 (Sept. 10, 1998 memo from Reid to Siniscalchi); VX 102 (Sept. 11, 1998 memo from Siniscalchi to Aksamentov regarding USRT-Holdings acquisition agreement); VX 103 (Sept. 30, 1998 letter from Reid to Siniscalchi).

[104] VX 101 (Sept. 10, 1998 memo from Reid to Siniscalchi); VX 103 (Sept. 30, 1998 letter from Reid to Siniscalchi).

[105] VX 97 (Reid's Deal Notes) at 107373.  Plaintiff argues that he was not "behind any prohibition on [USRT's] former members disclosing the [acquisition] to third parties[,] . . . [as the] confidentiality provision included in the Acquisition Agreement precluded disclosure only of 'Confidential Information,' which, as defined in the agreement, did not include the fact that USRT had a new owner."  POB at 31 n.12.  This argument, however, is inconsistent with the plain language of the USRT-Holdings acquisition agreement. *See* VX 28 (final USRT-Holdings acquisition agreement) § 4.4 ("As used herein, 'Confidential Information' shall mean . . . any information not available to the public generally and pertaining to the [satellite project], and . . . any other information disclosed in this Agreement or in any ancillary document executed in connection with this Agreement and the transactions contemplated hereby.").  Given that the USRT-Holdings acquisition agreement "disclose[s]" the "fact that USRT ha[s] a new owner"—namely, Holdings—the fact of such new ownership is plainly "Confidential Information" within the meaning of Section 4.4 of the acquisition agreement.

agreement evolved under Reid's watchful eye. Initially, a Capra-controlled entity, I.T.F.S. Ltd., was to acquire USRT, but eventually it was determined that a new Delaware entity, Holdings, would be designated as the "Buyer."[106] While the acquisition negotiations were ongoing, Reid and Reed severed communications with USRT's members, and Reed "moved out of the USRT Atlanta office, removed the primary USRT computer/data base and attempted . . . to erase the files."[107]

On October 5, 1998, USRT and its members entered into an acquisition agreement with Holdings.[108] Pursuant to that agreement, USRT's members sold their membership interests in USRT to Holdings in exchange for $300 million in revenue participation rights.[109]

## 2. Events Following Holdings' Acquisition of USRT

Upon Holdings' acquisition of USRT, Capra was named USRT's CEO and Siniscalchi was appointed COO.[110] For their part, Reid and Reed were appointed

---

[106] *Compare* VX 100 (acquisition agreement showing I.T.F.S. Ltd. as "Buyer"), *with* VX 28 (showing Holdings as "Buyer").

[107] VX 23 (Bell Memo) at BELLAK106; VX 108 (Sept. 15, 1998 fax from Bell to Simon); Aksamentov Dep. 587:9–588:10; Lawson Dep. 401:10–402:14; Bell Dep. 403:11–22.

[108] VX 28 ("Acquisition Agreement"); SX 48 (certificate of formation of Holdings).

[109] VX 28 (Acquisition Agreement) § 1.3.

[110] VX 28 (Acquisition Agreement) § 4.2.

officers of USRT (CFO and President, respectively) and each received an option to obtain a 5% equity interest in Holdings (which each exercised).[111]

Subsequently, Reid and Reed (not Siniscalchi) caused USRT's counsel, Mallenbaum, to be fired after Mallenbaum sent a complaint letter to FIN regarding its contacts with NPO-PM, a Russian satellite manufacturer.[112] Reid also developed plans to reduce revenue sharing payments to USRT's former members under the USRT-Holdings acquisition agreement.[113] Reid shared these plans with Reed via email, with instructions to "Delete, then delete from trash."[114]

Before long, the relationship between Reed/Reid and Capra/Siniscalchi deteriorated. Reed and Reid were fired from their positions at USRT in August 1999.[115]

---

[111] Compl. ¶ 29.

[112] VX 60 (Reid's handwritten notes, dated Mar. 1, 1999) at DEL0007671 (Reid: "[Reed] talked to SM [Mallenbaum]" and "told SM not attorney"); VX 61 (draft letter from Reed to counsel for InSpace, prepared by Reid, dated Feb. 1–2, 1999) (Reid: "There should be no copy to SM. Hopefully the hint is taken."); Reid Dep. 1271:22–1272:17, 1312:21–1313:13; SX 11 (Bryan Cave's Oct. 7, 1998 complaint letter to FIN).

[113] VX 124 (Dec. 30, 1998 email from Reid to Reed #1); VX 125 (Dec. 30, 1998 email from Reid to Reed #2); VX 126 (Dec. 31, 1998 email from Reid to Reed).

[114] VX 125 (Dec. 30, 1998 email from Reid to Reed #2).

[115] Compl. ¶ 29.

FIN was not advised of Holdings' acquisition of USRT until October 11, 1999.[116] Two days prior, FIN had entered into a memorandum of understanding with Gascom concerning a Russian satellite development project (the "FIN-Gascom MOU"),[117] pursuant to which:

- FIN and Gascom would "join forces with the aim to implement the project of building . . . Yamal 200&300 satellites . . .";[118]

- Gascom would contract with FIN to supply "Payloads, Telemetry, Tracking and Command Subsystem Hardware and other satellite equipment . . .";[119]

- Gascom would "acquire launch vehicles and provide orbital slots for the satellites";[120] *and*

- FIN would provide "credit financing to Gascom in the frame of [FIN]'s participation in the Project."[121]

---

[116] VX 133 (Pl.'s Resp. to Req. for Admission No. 34); Reid Dep. 1130:22–1131:15; Aksamentov Dep. 568:4–571:14, 577:5–578:25, 614:16–615:4, 660:15–661:8; Bell Dep. 341:6–343:14, 364:2–365:24, 367:25–368:3; Lawson Dep. 346:16–347:9, 491:19–493:17; Simon Dep. 172:10–12; Reed Dep. 177:9–179:24, 183:4–184:6, 187:1–24, 243:9–17; Zappa Dep. 97:12–99:1. Giorgio Zappa was the director general of ALS from 1996 to 2000. Zappa Dep. 17:5–18, 19:16–20:7.

[117] SX 31.

[118] SX 31 (FIN-Gascom MOU) § 1.1.

[119] SX 31(FIN-Gascom MOU) § 1.3.

[120] SX 31(FIN-Gascom MOU) § 1.3.

[121] SX 31 (FIN-Gascom MOU) § 1.4.

Ultimately, Italian financing for the satellite project never materialized, and FIN terminated the May 12 MOA on December 20, 1999,[122] but not before Reid had sent off a letter to the Italian government alleging, among other things, that he feared for his and his family's personal safety at the hands of "certain Italian officials," and that "the business of [USRT] has been potentially usurped by Italian state-owned businesses."[123]

## II. LEGAL ANALYSIS

Personal jurisdiction is a "threshold issue."[124] If Reid cannot sustain his burden to demonstrate that the Court may exercise personal jurisdiction over FIN under the conspiracy theory of jurisdiction (Plaintiff's only proffered theory), then it is appropriate for the Court to enter judgment for FIN on that basis without reaching the merits of the claims.[125] That is precisely the outcome required here. As explained below, this case is ripe, indeed overripe, for summary judgment.

---

[122] Giampaolino Aff. ¶¶ 90–103; Amicucci Aff. ¶ 18; VX 149 (FIN's Objs. and Resps. to Pl.'s Reqs. for Produc. of Docs.).

[123] VX 148 (Nov. 22, 1999 letter from Reid to senior Italian government official) at DEL0001423.

[124] *Amaysing Tech. Corp. v. Cyberair Commc'ns, Inc.*, 2005 WL 578972, at *6 n.30 (Del. Ch. Mar. 3, 2005).

[125] *See Onescreen, Inc. v. Hudgens*, 2010 WL 1223937, at *3 (Del. Ch. Mar. 30, 2010) (court noting that plaintiff's proffered basis for personal jurisdiction over the defendant rested on a "dubious proposition" and, therefore, it "need not [and would not] reach the merits" of the plaintiff's claims). To be sure, there is a reason Reid chose to ignore the dispute resolution provision in the May 12 MOA—his claims would not fare well on the

## A. Summary Judgment and the Determination of Personal Jurisdiction

On a motion for summary judgment, the court may grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[126] The movant "initially bears the burden of showing that [no genuine issues of material fact] are present."[127] In this regard, a dispute is not "genuine where no reasonable jury could find for the non-moving party under the appropriate burden of persuasion."[128] The essence of the inquiry is

---

merits before an English arbitrator when measured against the foreign law that governs them. He clearly came to Delaware in hopes that a Delaware judge might ignore the parties' choice of law and forum/arbitration, apply more favorable Delaware law and then allow his claims to be adjudicated on the merits against foreign defendants. Having now had an opportunity to review the applicable law as required by Court of Chancery Rule 44.1, I am satisfied that Reid's claims fail on the merits as well. Again, however, I need not reach the merits given my determination that these claims and these defendants do not belong in a Delaware court.

[126] Ct. Ch. R. 56(c).

[127] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[128] *Blizzard v. Watson*, 892 F. Supp. 587, 592 (D. Del. 1995) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). *See also Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002) ("The question is whether *any rational* finder of fact could find, on the record presented to the Court of Chancery on summary judgment viewed in the light most favorable to the non-moving party, that the substantive evidentiary burden had been satisfied.") (emphasis in original); *Point Mgmt., LLC v. MacLaren, LLC*, 2012 WL 2522074, at *20 (Del. Ch. June 9, 2012) ("A disputed fact does not alone give rise to a *genuine* or *material* factual dispute. Rather, the question is whether any rational fact-finder, upon reviewing the record before the court, could disagree as to the issue of material fact. If not, and the facts establish the moving party's right to relief, this Court may grant summary judgment in that party's favor.") (emphasis in original) (citing *Geier v. Meade*, 2004 WL 2430333, at *4–9 (Del. Ch. Jan. 30, 2004) (granting summary judgment where

32

"whether the parties have proof for their claims and defenses such that a trial is needed."[129] If the movant demonstrates the absence of genuine issues of material fact, then the burden shifts to the adverse party to "bring in some evidence showing a [genuine] dispute of material fact."[130] That evidence must be viewed in a light most favorable to the non-movant.[131] If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial," then no genuine issue of material fact exists and the movant is entitled to a judgment as a matter of law.[132]

Reid would have the Court conclude that because he has resisted the notion that the Court lacks personal jurisdiction over FIN, the Court must either hold him only to a *prima facia* showing of jurisdiction, or it *must* conduct an evidentiary hearing before determining whether he has demonstrated the presence of personal jurisdiction by a preponderance of the evidence.[133] That is not Delaware law.

---

the movant provided convincing evidence and the adverse party failed to present contrary evidence beyond conclusory denials)).

[129] 11 James W. Moore et al., *Moore's Federal Practice* ¶ 56.02[1] (3d ed. 2013).

[130] *Phillips v. Del. Power & Light Co.*, 216 A.2d 281, 285 (Del. 1966).

[131] *Burkhart v. Davies*, 602 A.2d 56, 60 (Del. 1991).

[132] *Id.*

[133] POB at 52–53.

33

It is true that "[p]rior to discovery, the plaintiff need only make a *prima facie* showing of jurisdiction in order to survive a motion to dismiss."[134]  But that is not where we are.  The parties have taken extensive jurisdictional discovery followed by merits discovery.  Under these circumstances, it is appropriate to require more from Reid than a mere *prima facie* showing.  He must now carry a burden of demonstrating the Court's personal jurisdiction over FIN by a "preponderance" of competent evidence.[135]  Whether the Court makes the jurisdictional determination after an evidentiary hearing, or on a fully developed record submitted to the Court in connection with a dispositive motion, is for the Court to decide in its discretion.[136]  And while it will most often be appropriate to conduct a hearing in order to make informed factual findings on disputed evidence in connection with a personal

---

[134] *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, at *7 (Del. Ch. Mar. 4, 2004).

[135] *Hart Hldg. Co., Inc. v. Drexel Burnham Lambert, Inc.,* 593 A.2d 535, 539 (Del. Ch. 1991).  *See also Medi-Tec*, 2004 WL 415251, at *2 ("Once jurisdictional discovery has been completed, however, the plaintiff must allege specific facts supporting its position.").

[136] *See Van De Walle v. L.F. Rothschild Hldgs., Inc.*, 1994 WL 469150, at *1 (Del. Ch. Aug. 2, 1994) ("While plaintiff is not restricted to the face of the complaint in pleading facts sufficient to confer personal jurisdiction, plaintiff bears the burden of establishing personal jurisdiction over the defendants.  Since the central question is one of fact, the court may hold a preliminary hearing and determine the necessary facts, or it may decide the matter on affidavits.") (internal quotation omitted); *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996) (noting that "the trial court is vested with a certain discretion" in determining the procedure by which to address the personal jurisdiction issue).

jurisdiction determination, when the facts of record overwhelmingly point to but one conclusion, an evidentiary hearing is not required.[137]

FIN has elected to renew its challenge to the Court's exercise of personal jurisdiction by a motion for summary judgment. The summary judgment standard directs that the court inquire, based on the record presented, whether any reasonable factfinder could reach a decision in favor of the nonmoving party.[138] That inquiry is no less applicable when the Court addresses the question of whether it may exercise personal jurisdiction over a defendant on a summary judgment record.[139]

## B. The Court Lacks Personal Jurisdiction Over FIN

"Delaware courts apply a two-step analysis in determining the issue of personal jurisdiction over a nonresident [defendant]."[140] First, the court must

---

[137] *See, e.g., Medi-Tec*, 2004 WL 415251, at *7 (addressing the personal jurisdiction issue on a complete summary judgement record without an evidentiary hearing); *Saraceno v. S.C. Johnson and Son, Inc.*, 83 F.R.D. 65, 72 (S.D.N.Y. 1979) (denying request for evidentiary hearing and granting renewed motion for summary judgment after jurisdictional discovery stating that plaintiff had made an "inadequate showing" of jurisdiction after extensive document discovery); *Scott v. Lackey*, 587 F. App'x. 712, 718 (3d Cir. 2014) (affirming grant of summary judgment on personal jurisdiction after trial court determined that an evidentiary hearing was not required).

[138] *Cerberus Int'l,* 794 A.2d at 1150.

[139] *See, e.g., Medi-Tec*, 2004 WL 415251, at *6 (holding on summary judgment that no reasonable factfinder could embrace plaintiff's theory of personal jurisdiction after considering plaintiff's proffered evidence).

[140] *See, e.g., Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992) (citing *LaNuova D & B S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986)).

determine whether the nonresident defendant is subject to the jurisdiction of Delaware courts under Delaware's long-arm statute.[141] Second, the court must determine whether exercising personal jurisdiction over the nonresident defendant is consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[142]

Delaware's long-arm statute provides, in relevant part, that "a court may exercise personal jurisdiction over any nonresident . . . who in person or through an agent . . . [t]ransacts any business or performs any character of work or service in the State [or] . . . [c]auses tortious injury in the State by an act or omission in this State . . . ."[143] "[A] single transaction is sufficient to confer [personal] jurisdiction where the claim is based on that transaction."[144] Additionally, the trial court must "broadly construe[]" the long-arm statute "to confer jurisdiction to the maximum extent possible under the Due Process Clause."[145] For purposes of the due process analysis, the relevant inquiry is whether the nonresident defendant maintained

---

[141] *Id.* Delaware's long-arm statute is codified at 10 *Del. C.* § 3104.

[142] *See Hercules*, 611 A.2d at 481 (citing *LaNuova*, 513 A.2d at 768).

[143] 10 *Del. C.* § 3104(c)(1), (c)(3).

[144] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000); *accord LaNuova*, 513 A.2d at 768.

[145] *Hercules*, 611 A.2d at 480.

sufficient "minimum contacts" with Delaware such that "compelling [the nonresident defendant] to defend [itself] in the State would be consistent with the traditional notions of fair play and substantial justice[.]"[146]

As noted, Reid's jurisdictional hook is now, and has been since the inception of this case, that the Court may exercise personal jurisdiction over FIN because it was co-conspirator in a scheme that had significant contacts with Delaware. Under the conspiracy theory of personal jurisdiction, the parties to a conspiracy are treated as each other's agents with respect to acts in furtherance of the conspiracy.[147] Thus, a substantial Delaware act by a conspirator in furtherance of the conspiracy may be attributed to nonresident co-conspirators if the co-conspirators knew or had reason to know of that act and the act "in [Delaware] was a direct and foreseeable result of the conduct in furtherance of the conspiracy."[148] In turn, if a conspirator's conduct in furtherance of the conspiracy subjects him to the jurisdiction of Delaware's courts, then the attribution of that conduct to nonresident co-conspirators will subject *all* of the conspirators to the jurisdiction of the Delaware courts.[149]

---

[146] *Waters v. Deutz Corp.*, 479 A.2d 273, 276 (Del. 1984) (internal quote and citation omitted).

[147] *See Hercules*, 611 A.2d at 481; *Chandler v. Ciccoricco*, 2003 WL 21040185, at *8 (Del. Ch. May 5, 2003).

[148] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982).

[149] *Id.*

"The conspiracy theory of jurisdiction is narrowly and strictly construed."[150] To establish conspiracy-based personal jurisdiction over a nonresident defendant, the plaintiff must "assert specific facts, not conclusory allegations, as to each [of the following] elements":[151]

(1) a conspiracy to defraud existed; (2) the [nonresident] defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[152]

According to Reid, Siniscalchi's formation of Holdings in Delaware, and Holdings' acquisition of all of USRT's membership interests, were "critical" steps in furtherance of the alleged Capra-Siniscalchi-FIN conspiracy to misappropriate the

---

[150] *Computer People, Inc. v. Best Int'l Gp., Inc.*, 1999 WL 288119, at *6 (Del. Ch. Apr. 27, 1999).

[151] *Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *10 (Del. Ch. June 15, 2011); *LVI Gp. Inv., LLC v. NCM Gp. Hldgs., LLC*, 2017 WL 3912632, at *2 (Del. Ch. Sept. 7, 2017) (same); *Vichi v. Koninklijke Philips Elec. N.V.*, 2009 WL 4345724, at *6 (Del. Ch. Dec. 1, 2009) (same). *See also Newspan, Inc. v. Hearthstone Funding Corp.*, 1994 WL 198721, at *8 (Del. Ch. May 10, 1994) (observing that "strong policy reasons underlie" the courts' requirement that the proponent of the conspiracy theory of personal jurisdiction provide a "firm basis" for the claim since to require less would risk hauling nonresident defendants into Delaware in a manner that would "offend traditional notions of justice and fair play"); 44 Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1069.4 (4th ed. 2017) (noting that courts require a "substantial showing in support of the allegations of a conspiracy" in order "to minimize the possibility that the allegations of conspiracy are being advanced to create jurisdiction but cannot, in fact, be supported").

[152] *Istituto Bancario*, 449 A.2d at 225.

satellite project from USRT for FIN's benefit. Specifically, Reid argues (1) Siniscalchi and Capra represented to USRT that Italy would not finance the satellite project unless USRT were owned by Italian citizens; (2) that this representation induced USRT's members to sell their USRT membership interests to Holdings; and (3) that Holdings' acquisition of USRT allowed Capra—the sole member of Holdings as of its formation—to "cause[] USRT to refrain from enforcing its rights" under the May 12 MOA, such that FIN misappropriated commercial opportunities reserved to USRT in the contemplated venture.[153]

The record, now supplemented by merits discovery, puts the lie to each of the elements of Reid's conjured conspiracy. Essential to Plaintiff's conspiracy theory is that FIN was the source of the alleged "Italian-owned" requirement. For instance, at the motion-to-dismiss stage, Plaintiff alleged, "It was [FIN] who first told USRT it would have to be owned by Italians in order to obtain financing – a claim that was later shown to be a fabrication. *Thus, the central falsehood that was communicated to the former members of USRT to induce them to give up control originated from* [FIN]."[154] Plaintiff continues to press that allegation now.[155]

---

[153] POB at 1.

[154] Pl.'s 2014 Br. at 63–64 (emphasis supplied).

[155] POB at 20 ("Beginning in the summer of 1998, and continuing into the fall of 1998, Capra, Finmeccanica, and Siniscalchi told USRT that in order to secure financing from the

After more than eight years of discovery, Reid has not adduced a shred of admissible evidence that FIN was the source of the alleged "Italian-owned" requirement. To the contrary, Reid's own notes reveal that it was Reid who "propose[d] a takeover of USRT by the Italians," not FIN.[156] Reid's denial of his own contemporaneous written statement—a denial unsupported by any competent evidence in the record—does not create a genuine dispute regarding whether *FIN*, in fact, proposed a takeover of USRT by "the Italians."[157] Moreover, even if Reid's conclusory denials were to be given any evidentiary weight, his denial that he proposed an Italian takeover of USRT does not suggest that FIN, in fact, proposed such a takeover. Indeed, Reid took proactive measures to prevent FIN from learning of Holdings' acquisition of USRT. For instance, he advised Siniscalchi that the USRT-Holdings acquisition agreement should include a confidentiality provision

---

Italian government, USRT would have to be owned by Italians. The source of this claim was Finmeccanica.").

[156] VX 92 (Reid Chronology) at DEL0011688.

[157] *See Point Mgmt., LLC*, 2012 WL 2522074, at *20 (Del. Ch. June 9, 2012) ("A disputed fact does not alone give rise to a *genuine* or *material* factual dispute) (emphasis in original); *Geier*, 2004 WL 2430333, at *4–9 (granting summary judgment where the movant provided convincing evidence and the adverse party failed to present contrary evidence beyond conclusory denials); *AT Engine Controls, Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*, 2014 WL 7270160, at *13 n.20 (D. Conn. Dec. 18, 2014) (noting that while "[i]t is true that [trial] courts generally should not weigh evidence or assess the credibility of witnesses when deciding a motion for summary judgment," it was, nevertheless, appropriate to reject a witness' conclusory litigation testimony denying overwhelming contemporaneous written evidence in his own hand because no reasonable fact-finder "could believe the [] testimony").

"effectively immediately (to limit whatever communication [was] occurring with [FIN])."[158]

After Reid's acquisition plan was implemented using the Delaware Holdings entity as the acquisition vehicle, Reid and Reed caused the firing of USRT's counsel, Mallenbaum, who was thought to be aligned with USRT's former members.[159] Reid then developed a secret plan to deprive USRT's former members of their revenue participation rights, while attempting to destroy evidence of the plan.[160] Reid would have the Court infer that it was Siniscalchi who fired Mallenbaum, and that the plan to deprive USRT's former members of their revenue participation rights, in fact, originated with FIN.[161] Here again, there is no admissible evidence in the record that would permit such an inference.[162]

---

[158] VX 97 (Reid's Deal Notes) at DEL0010737; Reid Dep. 952:1–954:7.

[159] VX 60 (Reid's handwritten notes, dated Mar. 1, 1999) at DEL0007671; VX 61 (draft letter from Reed to counsel for InSpace, prepared by Reid, dated Feb. 1–2, 1999) at DEL007679; VX 112 (email from Reid to Reed, dated Nov. 13, 1998); Reid Dep. 1271:22–1272:17, 1312:21–1313:13.

[160] VX 125 (Dec. 30, 1998 email from Reid to Reed #2); VX 126 (Dec. 31, 1998 email from Reid to Reed); Reid Dep. 1215:6–1217:4.

[161] POB at 34–35, 43-44.

[162] Siniscalchi's letter informing FIN that Mallenbaum was no longer USRT's attorney is dated November 4, 1999, not November 4, 1998 (*see* SX 185), and thus does not support the "timing"-based inferences Reid asks the Court to draw. *See* POB at 33–34 ("Based on [Siniscalchi's] November 4, 1998 communication to [FIN], it may reasonably be inferred that Siniscalchi fired USRT's counsel or that it was done with his approval, and that [FIN] was fully aware of [Holdings' acquisition of USRT].").

With the light of overwhelming evidence bearing down on his jurisdictional position, it is now clear that Reid misled the Court by crying "victim" of a Delaware-based conspiracy, when, in fact, he was an architect of the very wrongdoing that he claimed provided a basis for the Court to exercise long-arm jurisdiction over FIN. This, alone, is grounds to enter judgment in favor of FIN, since the exercise of jurisdiction over FIN under these circumstances would "offend traditional notions of fair play and substantial justice."[163]

Moreover, there is no evidence suggesting that FIN even knew about (much less orchestrated the formation of) Holdings—or Holdings' acquisition of USRT—until Reid himself informed FIN of the acquisition in October 1999.[164] Simply stated, Reid's claim that Siniscalchi's formation of Holdings was a "substantial act" in furtherance of a Capra-Siniscalchi-FIN conspiracy to deny USRT (and, by extension, Reid) the opportunity to pursue the satellite project has been unquestionably

---

[163] *See Waters*, 479 A.2d at 276; *see also* Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis*, 52 Fordham L. Rev. 234, 240 (1983) (discussing cases where conspiracy theory failed because, while "plaintiffs came forward with allegations of evidentiary facts tending to show the existence of a plan, they could not show that the plan was aimed at them or even that the plan resulted in the particular act that occurred in the forum state.").

[164] VX 133 (Pl.'s Resp. to RFA No. 34). *See Hartsel*, 2011 WL 2421003, at *10 (requiring specific showing of conspiracy, not conclusory allegations); *Istituto Bancario*, 449 A.2d at 225 (noting that, in Delaware, the conspiracy theory of jurisdiction presents a "strict test").

debunked.[165]  Rather, if anything, the evidence reveals that Holdings was a vehicle used to accomplish Reid's proposed "takeover of USRT by the Italians" for his own gain.[166]  No reasonable fact finder could conclude otherwise.  That being so, Siniscalchi's creation of Holdings cannot be attributed to FIN and cannot be the factual predicate upon which the FIN defendants, citizens of Italy, may be held to answer to a Delaware court.[167]

---

[165] Compl. ¶ 30 (FIN was "able to accomplish [the alleged misappropriation] only because of the change of control of USRT that had been effectuated in Delaware" via Holdings); Pl.'s 2014 Br. at 62 ("The formation of Holdings in Delaware [and] the change in control of USRT (a Delaware entity) . . . were critical to the accomplishment of Defendants' scheme. This supplies the required nexus between the act in Delaware and the wrong of which Plaintiff complains."); POB at 54 ("When Capra caused Siniscalchi to form Holdings in Delaware, when he acquired USRT, and when he caused USRT to refrain from enforcing its rights, he was acting for the sole benefit of [FIN]."). *See Istituto Bancario*, 449 A.2d at 225 (proponent of conspiracy theory must demonstrate that "a substantial act or substantial effect in furtherance of the conspiracy occurred" in Delaware).

[166] VX 92 (Reid Chronology) at DEL0011688.  *See Vichi*, 2009 WL 4345724, at *7 (Del. Ch. Dec. 1, 2009) (dismissing complaint alleging personal jurisdiction under the conspiracy theory and holding that the alleged Delaware acts must be connected to the causes of action alleged in the complaint, not some other scheme); *Terramar Retail Cent., LLC v. Marion #2-Seaport Trust*, 2017 WL 3575712, at *6 (Del. Ch. Aug. 18, 2017) ("When determining whether sufficient nexus exists [for personal jurisdiction], the principal factor that Delaware courts have examined is the extent of the factual relationship between the formation of the Delaware entity and the cause of action.").

[167] *See Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 114 (1987) (cautioning that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.").

## III.   CONCLUSION

For the foregoing reasons, FIN's motion for summary judgment is GRANTED.[168]  This is the Court's final judgment under Court of Chancery Rule 58.

**IT IS SO ORDERED.**

---

[168] As with FIN, the Court's exercise of personal jurisdiction over Capra, an Italian citizen, under the present circumstances would offend "traditional notions of fair play and substantial justice."  *Waters*, 479 A.2d at 276.  Even though Reid has represented that he is no longer prosecuting claims against Capra, for avoidance of doubt, summary judgment is granted in favor of Capra as well.  *Cf. Williams v. Life Savings & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986) ("[W]hen entry of a default judgment is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties. In reviewing its personal jurisdiction, the court does not assert a personal defense of the parties; rather, the court exercises its responsibility to determine that it has the power to enter the default judgment.").